UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

MICHAEL HOFFMAN,

    Plaintiff,

  v.

MICHAEL J. ASTRUE, Commissioner of Social Security,

    Defendant.

CASE NO. C09-5252RJB-KLS

REPORT AND RECOMMENDATION

Noted for March 12, 2010

Plaintiff, Michael Hoffman, has brought this matter for judicial review of the denial of his application for supplemental security income ("SSI") benefits. This matter has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule MJR 4(a)(4) and as authorized by Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261 (1976). After reviewing the parties' briefs and the remaining record, the undersigned submits the following Report and Recommendation for the Court's review.

## FACTUAL AND PROCEDURAL HISTORY

Plaintiff currently is 42 years old.[1] Tr. 55. He has a high school education and past relevant work

---

[1] Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access to Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

REPORT AND RECOMMENDATION
Page - 1

experience as a fast food cook, commercial cleaner and construction laborer. Tr. 35, 89, 95, 104, 113-15. On June 7, 2005, plaintiff filed an application for SSI benefits, alleging disability as of November 8, 2004, due to leg burns, back problems and depression/bereavement. Tr. 23, 82, 88, 112, 114. His application was denied initially and on reconsideration. Tr. 23, 55, 57, 72, 75.

A hearing was held before an administrative law judge ("ALJ") on December 18, 2007, at which plaintiff, represented by counsel, appeared and testified, as did a vocational expert. Tr. 397-427. On March 19, 2008, the ALJ issued a decision, determining plaintiff to be not disabled. Tr. 23-37. Specifically, the ALJ found in relevant part as follows:

(1) at step one of the sequential disability evaluation process,[2] plaintiff had not engaged in substantial gainful activity since June 7, 2005;

(2) at step two, plaintiff had "severe" impairments consisting of obesity with shortness of breath, sleep apnea, post traumatic stress disorder ("PTSD"), and learning disabilities;

(3) at step three, none of plaintiff's impairments met or medically equaled the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;

(4) after step three but before step four, plaintiff had the residual functional capacity to perform sedentary work, with certain additional non-exertional limitations;

(5) at step four, plaintiff was unable to perform his past relevant work; and

(6) at step five, plaintiff was capable of performing other jobs existing in significant numbers in the national economy.

Id. Plaintiff's request for review was denied by the Appeals Council on March 11, 2009, making the ALJ's decision the Commissioner's final decision. Tr. 6; 20 C.F.R. § 416.1481.

On April 30, 2009, plaintiff filed a complaint in this Court seeking review of the ALJ's decision. (Dkt. #1-#3). The administrative record was filed with the Court on July 20, 2009. (Dkt. #11). Plaintiff argues the ALJ's decision should be reversed and remanded to the Commissioner for an award of benefits or, in the alternative, for further administrative proceedings, because the ALJ erred in (a) evaluating the medical and lay witness evidence in the record regarding his mental functional limitations, and (b) finding him capable of performing other work existing in significant numbers in the national economy. For the

---

[2]The Commissioner employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920. If the claimant is found disabled or not disabled at any particular step, the disability determination is made at that step, and the sequential evaluation process ends. Id.

REPORT AND RECOMMENDATION
Page - 2

reasons set forth below, however, the undersigned disagrees that the ALJ erred in determining plaintiff to be not disabled, and therefore recommends that the ALJ's decision be affirmed. While plaintiff requests oral argument in this matter, the undersigned finds such argument to be unnecessary here.

## DISCUSSION

This Court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision. Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985). It is more than a scintilla but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than one rational interpretation, the Court must uphold the Commissioner's decision. Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).

I.  Preliminary Issue Regarding the Administrative Record

The record, as pointed out by plaintiff, contains medical progress notes from a treating physician, Michael Butler, M.D., for the period of late September through early October 2003, concerning treatment of a right foot injury for a Michael Hoffman. See Tr. 242-45. Plaintiff asserts this Mr. Hoffman is not him, and defendant agrees that the above medical records do appear to be for an individual other than plaintiff. Accordingly, the undersigned agrees with plaintiff that all such records should be removed from the record, and that the Clerk should be directed to do so in the manner set forth in the Conclusion section below. The undersigned disagrees, however, that remand is necessary for the purpose of determining whether any of plaintiff's own medical records were misplaced in the other Mr. Hoffman's file, as there is no evidence that any such misplacement has occurred.

II. The ALJ's Evaluation of the Medical Evidence in the Record Concerning Plaintiff's Mental Functional Limitations

The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998). Where the medical evidence in the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982). In such cases, "the ALJ's conclusion

must be upheld." Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th Cir. 1999). Determining whether inconsistencies in the medical evidence "are material (or are in fact inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts "falls within this responsibility." Id. at 603.

In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be supported by specific, cogent reasons." Reddick, 157 F.3d at 725. The ALJ can do this "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Id. The ALJ also may draw inferences "logically flowing from the evidence." Sample, 694 F.2d at 642. Further, the Court itself may draw "specific and legitimate inferences from the ALJ's opinion." Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of either a treating or examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996). Even when a treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." Id. at 830-31. However, the ALJ "need not discuss *all* evidence presented" to him or her. Vincent on Behalf of Vincent v. Heckler, 739 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in original). The ALJ must only explain why "significant probative evidence has been rejected." Id.; see also Cotter v. Harris, 642 F.2d 700, 706-07 (3rd Cir. 1981); Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

In general, more weight is given to a treating physician's opinion than to the opinions of those who do not treat the claimant. Lester, 81 F.3d at 830. On the other hand, an ALJ need not accept the opinion of a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or "by the record as a whole." Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1195 (9th Cir. 2004); Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001). An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician." Lester, 81 F.3d at 830-31. A non-examining physician's opinion may constitute substantial evidence if "it is consistent with other independent evidence in the record." Id. at 830-31; Tonapetyan, 242 F.3d at 1149.

If a disability determination "cannot be made on the basis of medical factors alone at step three of

1  the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and
2  assess his or her "remaining capacities for work-related activities." SSR 96-8p, 1996 WL 374184 *2.  A
3  claimant's residual functional capacity ("RFC") assessment is used at step four to determine whether he or
4  she can do his or her past relevant work, and at step five to determine whether he or she can do other work.
5  Id.  It thus is what the claimant "can still do despite his or her limitations." Id.

6  A claimant's residual functional capacity is the maximum amount of work the claimant is able to
7  perform based on all of the relevant evidence in the record. Id.  However, a claimant's inability to work
8  must result from his or her "physical or mental impairment(s)." Id.  Thus, the ALJ must consider only
9  those limitations and restrictions "attributable to medically determinable impairments." Id.  In assessing a
10 claimant's RFC, the ALJ also is required to discuss why the claimant's "symptom-related functional
11 limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other
12 evidence." Id. at *7.

13 The ALJ assessed plaintiff with the mental residual functional capacity "to perform simple and
14 repetitive tasks, but not detailed or complex tasks." Tr. 29.  The ALJ expressly determined as well that no
15 social limitations were "warranted" in plaintiff's residual functional capacity. Tr. 30.  Plaintiff argues that
16 this latter finding is not supported by the substantial medical and lay witness evidence in the record, and
17 that the limitation to simple, repetitive tasks does not adequately capture his difficulties with
18 concentration, persistence and pace based on the same evidence.  The undersigned disagrees.  That
19 objective medical and lay witness evidence shall be addressed separately below.

20     A.     <u>Social Limitations</u>
21         1.     <u>Dr. Wheeler</u>

22 In early June 2005, Kimberly Wheeler, Ph.D., performed a psychological evaluation of plaintiff,
23 finding him to be moderately limited in his ability to relate appropriately to co-workers and supervisors,
24 respond appropriately to and tolerate the pressures and expectations of a normal work setting, care for
25 himself, and maintain appropriate behavior. Tr. 272.  The ALJ gave "the rating of 'moderate' limitations in
26 these social areas little weight," because he found "little support for" those limitations in Dr. Wheeler's
27 mental status examination, and because the explanation Dr. Wheeler gave for them indicated they "were
28 due to circumstances unrelated to" plaintiff's "mental health impairment," noting specifically that:

> . . . As regards transportation, the claimant reported that he was unable physically to walk to the bus stop. He did not allege that he was unable to tolerate the social exposure/contact involved in public transportation. Ex 14F/14. As regards socialization, the claimant reported that he had no friends "here." Considering the claimant had moved from Texas only a few months before this examination, his lack of friends "here" cannot be attributed solely to mental health symptoms, and his report implies that he did have friends in Texas. The same is true with regard to groups/clubs/church. . . .

Tr. 33; see also Tr. 271-72, 274-76.

Plaintiff argues these are not valid reasons for rejecting the moderate social limitations Dr. Wheeler found in early June 2005. The undersigned disagrees. For example, the ALJ need not accept the opinion of even a treating physician, if that opinion is inadequately supported by clinical findings. See Batson, 359 F.3d at 1195 (ALJ need not accept opinion of even treating physician if it is inadequately supported by clinical findings). In addition, discrepancies between a medical opinion source's functional assessment and that source's clinical notes, recorded observations or other comments regarding a claimants capabilities "is a clear and convincing reason for not relying" on the assessment. Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005); see also Weetman v. Sullivan, 877 F.2d 20, 23 (9th Cir. 1989). The ALJ, therefore, did not err here.

Dr. Wheeler performed another psychological evaluation of plaintiff in early November 2005, assessing him with the same social limitations, but this time also finding him to be markedly limited in his ability to relate appropriately to co-workers and supervisors and respond appropriately to and tolerate the pressures and expectations of a normal work setting. Tr. 265. The ALJ rejected these social limitations as well, because Dr. Wheeler "gave no explanation of why she assessed such substantially greater [social] limitations just 5 months after the preceding evaluation," and because no such explanation was evidenced in the record. Tr. 33. The ALJ went on to note as follows:

> . . . In fact, the record shows that in November of 2005, the same month of [this more recent] evaluation, the claimant told his provider at Kitsap Mental Health Services that he was getting out more socially. Ex 17F/4. Without a corresponding decrease in performance on examination or even increased subjective complaints, the change in ratings appears arbitrary. I therefore give this assessment little weight. . . .

Id. Again, these are valid reasons the ALJ gave for not adopting the moderate to marked social limitations Dr. Wheeler found. See Batson, 359 F.3d at 1195 (ALJ need not accept medical opinion if inadequately supported by clinical findings or by record as whole); Bayliss, 427 F.3d at 1216; Weetman, 877 F.2d at 23.

Based on a third psychological evaluation performed in late September 2006, Dr. Wheeler opined

that plaintiff was only moderately limited in his ability to interact appropriately in public contacts and to respond appropriately to and tolerate the pressures and expectations of a normal work setting, and mildly to moderately limited in his ability to relate appropriately to co-workers and supervisors and to maintain appropriate behavior. Tr. 303. The ALJ noted these findings as further proof that the early more severe social limitations found by Dr. Wheeler were unsupported by the evidence in the record. See Tr. 33. In addition, while the ALJ did not specifically state why he did not adopt the moderate limitations found by Dr. Wheeler at this time, the Court can reasonably infer that he relied on the same reasons, given that the clinical findings produced at the time were similarly deficient. See Tr. 302-03, 305-07; see also Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989) (district court may draw specific and legitimate inferences from ALJ's opinion).

### 2. Dr. Neims

Plaintiff also argues the ALJ erred in rejecting the moderate social limitations Dan Neims, Ph.D., another examining psychologist, assessed him with in mid-August 2007. Specifically, Dr. Neims found plaintiff to be moderately limited in his ability to interact appropriately in public contacts, respond appropriately to and tolerate the pressure and expectations of a normal work setting, care for himself, and maintain appropriate behavior. Tr. 338. Here too, the ALJ rejected these limitations because "no basis for" them was indicated by Dr. Neims in his evaluation report, noting that Dr. Neims found plaintiff to be both friendly and cooperative, and that he "made no other mention of symptoms, observations, or other signs of impaired social functioning." Tr. 34. Accordingly, the ALJ once more did not err in giving Dr. Neims findings here "little weight" due to the lack of supporting objective evidence therefor. Id.; see Batson, 359 F.3d at 1195; Bayliss, 427 F.3d at 1216; Weetman, 877 F.2d at 23.

### 3. Dr. Redmon

Lastly in terms of the medical opinion source evidence in the record, plaintiff argues the ALJ erred as well in rejecting the moderate limitations Marc Redmon, Psy.D., found in late November 2007, that he had in his ability to accept instructions and respond appropriately to criticism from supervisors and in his ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. Tr. 376-77. In regard to those findings, the ALJ stated in relevant part that:

> . . . Presumably these conclusions were based on the doctor's findings on Personality Assessment Inventory (PAI), as that is the only area of the doctor's report that addresses social functioning, other than as discussed below. The doctor explained that

REPORT AND RECOMMENDATION
Page - 7

> test showed the claimant appeared to be distant, typically, in his personal relationships and showed he may not approach social interactions with [sic] "with much enthusiam." Dr. Redmon felt the claimant "anticipates negative evaluation by others and therefore avoids most forms of social interaction." He also felt it likely that the claimant "tends to be a bit of a loner in job settings, limiting his effectiveness in working with others." Ex 24F/9. I have considered these conclusions but find them inconsistent with the medical evidence of record, including Dr. Redmon's interaction with the claimant. In his report, Dr. Redmon described the claimant as friendly, polite, cooperative, and forthcoming. The doctor said the claimant quickly established rapport, used humor to good effect, and easily maintained good eye contact. His speech was fluent and well-modulated with no difficulty in his use of expressive or receptive language. Ex 24F/5. As noted above, Dr. Niems also found the claimant to be friendly and cooperative. Ex 20F/5. The claimant's witnesses reported the claimant got along well with family, friends, and neighbors. The very fact 4 people provided witness statements shows that he has several close relationships. I therefore find the findings on the PAI to be in doubt, as the evidence contradicts the finding that the claimant was typically distant in his personal relationships.

Tr. 34-35; see also Tr. 365, 368, 372. Again, inconsistencies between a medical sources assessment of a claimant's ability to function and that source's own clinical findings, as well as the evidence in the record as a whole, constitute valid reasons for not adopting that assessment. See Batson, 359 F.3d at 1195. Thus, the ALJ did not err in evaluating the objective medical evidence in the record concerning plaintiff's social limitations, including that provided by Drs. Wheeler, Neims and Redmon.

### 4. The Lay Witness Evidence

Lay testimony regarding a claimant's symptoms "is competent evidence that an ALJ must take into account," unless the ALJ "expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001). In rejecting lay testimony, the ALJ need not cite the specific record as long as "arguably germane reasons" for dismissing the testimony are noted, even though the ALJ does "not clearly link his determination to those reasons," and substantial evidence supports the ALJ's decision. Id. at 512. The ALJ also may "draw inferences logically flowing from the evidence." Sample, 694 F.2d at 642.

Plaintiff argues the ALJ erred in rejecting the statements of the lay witnesses in the record, who reported their observations regarding difficulties he had in social functioning. See, e.g., Tr. 134, 136-38, 155-56, 166, 171, 176, 181. As discussed above, however, the ALJ expressly noted that "[t]he very fact 4 people provided witness statements" showed he had "several close relationships." Tr. 35. The ALJ also noted in relevant part as follows:

> . . . [W]hile the claimant's witnesses seemed to report that he isolated for social reasons, the claimant reported that he stayed in his room to avoid excess walking,

> which he said aggravated his back and leg pain and swelling. *See* Ex 8E/1. The picture presented by the witness statements is that the claimant preferred to isolate socially but nevertheless would interact socially with friends, family, neighbors, and strangers if "forced"or if the circumstances called for it. *See e.g.* Ex 17E/3, 15E/3, 14/E4, 9E/5, 9E/6. This reveals a preference to avoid social situations, not a requirement that flows from the claimant's mental health impairments.

Id. It is true, as plaintiff points out, that in one of his own self-reports, he indicated that he did not spend time with others because he was depressed, as well as being in pain a lot. See Tr. 129.

The undersigned finds, however, that the ALJ's characterization of the lay witness statements and those of plaintiff on the issue of social functioning overall to be supported by the substantial evidence in the record. For example, in that same self-report, plaintiff stated that he spent "a lot of time in" his room alone because the more he walked around, the more his back started to hurt and the more his legs started to swell up and get painful. Tr. 125. In addition, plaintiff indicated that he got along okay with authority figures, including bosses, and that his injuries/conditions did not affect his ability to get along with others. Tr. 130-31. Further, while there are some conflicting statements in the lay witness evidence in the record concerning plaintiff's ability to interact socially and the causes of his reported tendency to isolate, many of those statements – and plaintiff's own testimony – indicate causes other than being due to mental health issues. They also indicate an ability to function in social situations, including the workplace. See Tr. 133-34, 136-39, 151, 155-56, 166, 171, 176, 181, 409. In any event, it is the ALJ who is solely responsible for resolving ambiguities and conflicts in the evidence. See Reddick, 157 F.3d at 722; Morgan, 169 F.3d at 601; Sample, 694 F.2d at 642. He did not err in this case in doing so.

B.  Difficulties with Concentration, Persistence and Pace

Plaintiff argues the ALJ erred in rejecting the observation of Dr. Redmon in early November 2007, that "[s]ignificant deficits in attention and concentration were apparent in his ability to perform serial sevens," that psychological testing revealed "the presence of severe attentional deficits," and that he was moderately limited in his ability to maintain attention and concentration for extended periods," i.e., for "approximately 2-hour segments." Tr. 368, 370, 373, 376. The ALJ rejected these limitations as being inconsistent with Dr. Redmon's "own report," further stating that:

> On mental status examination, Dr. Redmon found significant deficits in the claimant's attention and concentration when performing sevens; however, the claimant was able to spell the word "world" correctly both forward and backward and evidenced no difficulty following the course of conversation throughout the interview and the subsequent testing. The doctor himself reported the tests took 4.5 hours to complete,

REPORT AND RECOMMENDATION
Page - 9

> which means the claimant was able to sustain his attention and concentration for that
> amount of time. It is reasonable to presume Dr. Redmon gave the claimant some
> breaks during this testing, but none out of the ordinary, as the doctor would surely
> report that if it were the case. I also note the claimant reported in June of 2005 that he
> could pay attention for a "long time." Ex 8E/6. At the hearing, held in December of
> 2007, the claimant reported that he read and in fact had recently completed a Harry
> Potter book. I note these books are several hundred pages in length and therefore
> clearly would require a significant degree of attention and concentration. I also note
> that Dr. Redmon found the claimant scored in the low average range on the testing,
> with significant attentional deficits and a learning disability in math and spelling.
> However, the claimant displayed sentence comprehension skills at the 12th grade level,
> thus showing no significant difficulties in reading. Ex 24F/8-9.

Tr. 34.

Plaintiff argues that in so finding, the ALJ improperly substituted his own lay opinion for that of Dr. Redmon. See Gonzalez Perez v. Secretary of Health and Human Services, 812 F.2d 747, 749 (1st Cir. 1987) (ALJ may not substitute own opinion for findings and opinion of physician); McBrayer v. Secretary of Health and Human Services, 712 F.2d 795, 799 (2nd Cir. 1983) (ALJ cannot arbitrarily substitute own judgment for competent medical opinion); Gober v. Mathews, 574 F.2d 772, 777 (3rd Cir. 1978) (ALJ not free to set own expertise against that of physician who testified before him). The undersigned disagrees, as the ALJ did not arbitrarily substitute his expertise for that of Dr. Redmon, but rather appropriately pointed to other evidence in the record, including that set forth in Dr. Redmon's own evaluation report, to find that such evidence did not fully support Dr. Redmon's conclusion regarding plaintiff's ability to concentrate or maintain attention. This was wholly within the ALJ's sphere of responsibility, and, accordingly, he did not err in so finding.

Plaintiff further argues the ALJ erred in failing to give germane reasons for rejecting the statements of the lay witnesses in the record regarding his difficulty in staying on task. The ALJ, however, did address the lay witness statements here, specifically stating in relevant part:

> . . . I have considered each of the statements but have not given them full weight, due to
> inconsistencies among the witnesses or between the witnesses and the claimant or due
> to a lack of objective medical evidence to support the allegations. . . .
>
> . . .
>
> Some witnesses mentioned the claimant became frustrated about his memory problems
> or when plans were changed. They said the claimant sometimes needed reminders to
> perform or finish tasks. Interestingly, the claimant's sister claimed in her statement
> from December of 2007 that the claimant no longer read (Ex 15E/4), but at the hearing
> the claimant testified that he read and admitted to problems with reading only
> "sometimes." I have taken these statements into consideration and feel the limitation to
> simple and repetitive tasks adequately accommodates these issues. The limitation to

simple tasks accommodates the claimant's memory problems, and repetitive work
should prevent the stress involved in change of plans or routine.

Tr. 29-30; see also Tr. 130, 138. These are all germane reasons for discounting the credibility of the lay witness statements in the record on this issue. See Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir. 1984) (proper for ALJ to discount lay testimony that conflicts with available medical evidence); Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001); An ALJ may reject lay witness evidence if other evidence in the record regarding the claimant's activities is inconsistent therewith. See Carmickle v. Commissioner, Social Sec. Admin., 533 F.3d 1155, 1164 (9th Cir. 2008) (rejecting lay witness evidence because it was inconsistent with other evidence in record regarding claimant's activities); but see Bruce v. Astrue, 557 F.3d 1113, 1116 (finding ALJ improperly rejected testimony of claimant's family on basis that medical records did not corroborate claimant's symptoms).

III.   The ALJ's Step Five Analysis

If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation process the ALJ must show there are a significant number of jobs in the national economy the claimant is able to do. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. § 416.920(d), (e). The ALJ can do this through the testimony of a vocational expert or by reference to the Commissioner's Medical-Vocational Guidelines (the "Grids"). Tackett, 180 F.3d at 1100-1101; Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2000). At the hearing in this case, in response to a hypothetical question the ALJ posed, the vocational expert testified that plaintiff could perform the jobs of microfilm document preparer (Dictionary of Occupational Titles ("DOT") 249.587-018) and optical assembler (DOT 713.687-018). Tr. 417-21. Based on the vocational expert's testimony, the ALJ found plaintiff to be capable of performing other jobs existing in significant numbers in the national economy. Tr. 36.

   A.   The Job of Microfilm Document Preparer

Plaintiff argues the ALJ erred in finding him capable of performing the job of microfilm document preparer, because the DOT defines that job as requiring the ability to perform at a level above the limitation to simple, repetitive tasks set forth in his RFC assessment. The undersigned agrees. The DOT's definition of the job of microfilm document preparer requires Level 3 reasoning, which is describes as follows:

Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or

from standardized situations.

DOT 249.587-018; DOT, Appendix C. Although there is some disagreement among the various courts as to whether a limitation to simple, repetitive tasks is analogous to Level 2 reasoning or is more analogous to Level 1 reasoning,[3] the undersigned agrees with the Tenth Circuit that such limitation is "inconsistent with the demands of level-three reasoning." Hackett v. Barnhart, 395 F.3d 1168, 1176 (10th Cir. 2005) (finding Level 2 reasoning to be more consistent with simple, routine work tasks) (citing Lucy v. Chater 113, F.3d 905, 909 (8th Cir. 1997) (rejecting contention that claimant limited to following simple instructions could engage in full range of sedentary work, because many unskilled jobs in that category require reasoning levels of two or higher)).

The ALJ may rely on vocational expert testimony that "contradicts the DOT, but only insofar as the record contains persuasive evidence to support the deviation." Johnson v. Shalala, 60 F.3d 1428, 1435 (9th Cir. 1995). The ALJ, furthermore, has the affirmative responsibility to ask the vocational expert about possible conflicts between her testimony and information in the DOT. Haddock v. Apfel, 196 F.3d 1084, 1091 (10th Cir. 1999); SSR 00-4p, 2000 WL 1898704. Thus, before relying on evidence obtained from a vocational expert to support a finding of not disabled, the ALJ must "elicit a reasonable explanation for any discrepancy" with the DOT. Haddock, 196 F.3d at 1087; SSR 00-4p, 2000 WL 189704 *1. The ALJ also must explain how the discrepancy or conflict was resolved. SSR 00-4p, 2000 WL 189704 *4. Because the ALJ did not do so here, he erred.

Defendant argues the ALJ did not err here, because the complexity of a job's tasks is determined not by its reasoning level, but by its specific vocational preparation ("SVP")[4] number. In this case, the job of microfilm document preparer has an SVP of 2, which requires "[a]nything beyond short demonstration

---

[3]Level 2 reasoning is defined as:

Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations.

DOT, Appendix C. Level 1 reasoning, in turn, is defined as:

Apply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job.

Id.

[4]SVP is defined as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." DOT, Appendix C.

REPORT AND RECOMMENDATION
Page - 12

up to and including 1 month." Tr. 36, 420; DOT 249.587-018; DOT, Appendix C. Defendant asserts that because unskilled work has been defined by the Commissioner as simple work with an SVP of 1 or 2, there is no conflict between the vocational expert's testimony and the information in the DOT that the ALJ was required to resolve. Defendant, however, erroneously equates unskilled work with the residual functional capacity restriction to simple, repetitive tasks.

In attempting to so equate the two, defendant relies on the definition of unskilled work contained in the Commissioner's regulations, which is work "which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 416.968(a). A job is deemed unskilled if "a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed." Id.; see also SSR 00-4p, 2000 WL 1898704 *3 ("[U]nskilled work corresponds to an SVP of 1-2."). Although the Ninth Circuit has not decided this specific issue, at least one other district court in this circuit, faced with a substantially similar situation and argument made by the Commissioner, has done so, resolving it as follows:

> Key to the present case is the ALJ's finding that [the claimant's] ailments limited her to work involving simple tasks performed at a routine or repetitive pace. [The claimant] asserts that such a restriction is inconsistent with her ability to perform any of the other work as the descriptions of those jobs in the Dictionary of Occupational Titles ("DOT") require a higher reasoning capacity than that allowed by the ALJ's RFC.
>
> [The claimant] argues that the rub comes from the fact that the other work, which the ALJ pointed to as something which she could perform and, hence, the reason for denying her benefits, requires a level of reasoning beyond that contemplated as "simple, repetitive."
>
> The DOT describes the . . . job as requiring a reasoning level of two out of a six-point scale. A level two reasoning indicates that the job requires the person to be able to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions," and "[d]eal with problems involving a few concrete variables in or from standardized situations." . . . This leaves the question of whether such a reasoning level is consonant with a limitation to simple, repetitive mental tasks.
>
> The Commissioner argues that it does, but does so by pointing to a separate vocational consideration listed in the DOT-a job's specific vocational preparation ("SVP") score. The . . . job is considered an unskilled one under the DOT's SVP scores. The Commissioner contends that because the job had an SVP level of two, which essentially is unskilled work, the vocational expert's opinion does not conflict with the DOT. . . . Unskilled work is defined under Social Security regulations as requiring little or no judgment to do simple duties that can be learned on the job in a short period of time. . . . Because the job duties for [the claimant's] work . . . would be simple ones, the Commissioner posits that the reasoning required to perform those jobs must necessarily be simple as well and, hence, not in conflict with

REPORT AND RECOMMENDATION
Page - 13

> the ALJ's "simple, repetitive" functional restriction.
>
> The problem for the Commissioner is that she is conflating two separate vocational considerations. Other courts decided that, contrary to the Commissioner's argument here, the SVP level in a DOT listing indicating unskilled work, does not address whether a job entails only simple, repetitive tasks. *See, e.g., Lucy v. Chater*, 113 F.3d 905, 909 (8th Cir.1997); *Cooper v. Barnhart*, 2004 WL 2381515, at *4 (N.D.Okla. Oct.15, 2004); *Hall v. Barnhart*, 2004 WL 1896969, at *3 (D.Me. Aug.25, 2004). A job's SVP is focused on "the amount of lapsed time" it takes for a typical worker to learn the job's duties. . . . A job's reasoning level, by contrast, gauges the minimal ability a worker needs to complete the job's tasks themselves. As one court noted, "SVP ratings speak to the issue of the level of vocational preparation necessary to perform the job, not directly to the issue of a job's simplicity, which appears to be more squarely addressed by the GED [reasoning level] ratings." *Hall-Grover v. Barnhart*, 2004 WL 1529283, at *4 (D.Me. April 30, 2004). Here, the one vocational consideration directly on point with the limitation contained in the RFC is a job's reasoning level score.

Meissel v. Barnhart, 403 F.Supp.2d 981, 982-83 (9th Cir. 2005) (footnote and internal citations omitted).

The undersigned finds the reasoning of the above district court's opinion, and that of the other courts cited and quoted therein, persuasive, and hereby adopts it. See, e.g., Cooper, 2004 WL 2381515 at *4 ("The explanations of SVP in the DOT suggest that the SVP specifies the vocational preparation required to perform a job. The reasoning level . . . appears more similar to whether or not a claimant has a limitation to performing only simple tasks.").

Indeed, this appears to be the approach taken by other circuit courts as well. The Eighth Circuit, for example, has noted that:

> The Social Security's own list of unskilled sedentary jobs . . . indicates that many jobs within this range require more than the mental capacity to follow simple instructions. For each job described, the *Dictionary of Occupational Titles* specifies the type of reasoning capabilities the job requires. 2 U.S. Dep't of Labor, *Dictionary of Occupational Titles*, 1010-11 (4th ed. 1991). For instance, a job rated reasoning level one requires the ability to understand and carry out simple instructions, whereas a job rated reasoning level two requires the ability to understand and carry out detailed instructions. *Id.* at 1011. Many of the jobs listed require level two reasoning or higher in the unskilled sedentary job category.

Lucy v. Chater, 113 F.3d 905, 909 (8th Cir. 1997). In addition, the Tenth Circuit – in addressing two jobs with the same reasoning level at issue here – more recently held as follows:

> The DOT states that both [jobs] require a reasoning level of three, defined as the ability to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form [, and d]eal with problems involving several concrete variables in or from standardized situations." . . . Plaintiff argues that her RFC, as found by the ALJ, is incompatible with jobs requiring a reasoning level of three. The ALJ's findings with regard to Plaintiff's RFC include: "Mentally, [Plaintiff] retains the attention,

> concentration, persistence and pace levels required for simple and routine work tasks." . . . This limitation seems inconsistent with the demands of level-three reasoning. *See Lucy v. Chater*, 113 F.3d 905, 909 (8th Cir.1997) (rejecting contention that a claimant limited to following only simple instructions could engage in the full range of sedentary work because many unskilled jobs in that category require reasoning levels of two or higher). We note that level-two reasoning requires the worker to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions [and d]eal with problems involving a few concrete variables in or from standardized situations." . . . This level-two reasoning appears more consistent with Plaintiff's RFC.

Hackett v. Barnhart, 395 F.3d 1168, 1176 (10th Cir. 2005) (internal citations omitted). The undersigned agrees with the Tenth Circuit that jobs requiring a reasoning level of 3 are incompatible with a limitation to simple, routine, or in this case repetitive, work. Accordingly, because the ALJ did not ask the vocational expert whether her testimony regarding the job of microfilm document preparer varied from the description of that job contained in the DOT, or acknowledge and resolve any such variance, he erred.

B.  The Job of Optical Assembler

The undersigned, however, disagrees with plaintiff that it is necessary to remand this matter to determine whether the remaining job identified by the vocational expert, that of optical assembler, exists in significant numbers. At the hearing, the vocational expert testified that there were approximately 9,000 such jobs in the national economy, and 150 in the State of Washington. Tr. 421. Plaintiff argues that no published case in this circuit has found 150 jobs to be a significant number of jobs, and that it therefore is doubtful this amount would be deemed significant. As admitted by plaintiff, however, there is no bright line test as to what constitutes a significant number of jobs. See Barker v. Secretary of Health & Human Services, 882 F.2d 1474, 1478 (9th Cir. 1989) ("This Circuit has never clearly established the minimum number of jobs necessary to constitute a 'significant number.'").

Work exists in the national economy when there are "a significant number of jobs (in one or more occupations) having requirements" which the claimant is "able to meet" with the claimant's "physical or mental abilities and vocational qualifications." 20 C.F.R. § 416.966(b). As the Social Security Act itself states:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, <u>regardless of whether such work exists in the immediate area in which he lives</u>, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A) (emphasis added). Thus, Congress "explicitly determined that it is the *existence* of jobs that is essential," and that the ALJ "is *not* required to consider the hiring practices of employers, or whether a claimant could actually obtain work if he applied for it. Martinez v. Heckler, 807 F.2d 771, 774-75 (9th Cir. 1987) ("This circuit has consistently held . . . that the definition of disability is based upon the *existence* of jobs in significant numbers in the national economy.") (emphasis in original).

The phrase "work which exists in the national economy" is defined in the Social Security Act to mean work existing "in significant numbers either in the region where" the claimant "lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A)) (emphasis added); 20 C.F.R. § 416.960(c)(1) ("Any other work (jobs) that you can adjust to must exist in significant numbers in the national economy (*either in the region where you live or in several regions in the country*.") (emphasis added). Thus, while plaintiff may seek to call into question the existence of significant numbers of optical assembler jobs in the State of Washington, the "appropriate focus" here at step five is, as noted by the Eleventh Circuit, the national, not local, economy. Allen v. Bowen, 816 F.2d 600, 603 (11th Cir. 1987) (citing Mathews v. Eldridge, 424 U.S. 319, 336 (1976)). As succinctly put by one district court:

> Although the vocational expert identified only "a single job, the Social Security Act affords benefits only to those who cannot 'engage in *any* other kind of substantial gainful work which exists in the national economy[.]'" *Renna v. Barnhart*, 2007 WL 602395, at *5 (E.D.N.Y. Feb. 21, 2007) (citing 42 U.S.C. § 432(d)(2)(A) (emphasis added) & *Dumas v. Schweiker*, 712 F.2d 1545, 1553 (2d Cir. 1983) (affirming step-five determination based on evidence of only one job). Furthermore, the [Social Security] Regulations state that the Commissioner is to consider whether significant numbers exist "***either*** in the region where [the claimant live] ***or*** in several other regions of the country" but the focus need not be on the immediate area in which an individual lives. 20 C.F.R. §§ 404.1566(a) & 416.966(a) (emphasis added). Thus, the vocational expert's testimony stating that there were approximately 100,000 jobs of this nature in the national economy and 125 locally constitutes a significant number. *Id.* at §§ 404.1566(b) & 416.966(b) (cited in *Wright v. Chater*, 969 F.Supp. 143, 148 (W.D.N.Y. 1997)); *see also Dumas v. Schweiker*, 712 F.2d at 1549 (holding that 150 jobs in the region and 112,000 jobs in the national economy constituted a significant number of jobs); *Craigie v. Bowen*, 835 F.2d 56, 58 (3d Cir. 1987) (finding that 200 jobs was a significant number); *Allen v. Bowen*, 816 F.2d 600, 602 (11th Cir. 1987) (stating that 174 jobs in the local area and 80,000 nationwide constituted a significant number). . . .

Bull v. Commissioner of Social Security, 2009 WL 799966 *6 (N.D.N.Y.).[5]

---

[5] It is true, as defendant notes, that the Ninth Circuit stated in Barker that it rejected the "suggestion that the number of jobs must be considered in the context of the geographical area at issue, or in light of the population of the area." 882 F.2d at 1479. In so rejecting this suggestion, however, the Ninth Circuit merely noted that it was declining "to ignore the number of jobs" a claimant could perform with his or her limitations, and instead "analyze the ratio of jobs to the general population of the" local geographical area at issue. Id. (quoting Martinez, 807 F.2d at 775). The Ninth Circuit went on to explain that even if "credible numbers on total existing . . . jobs" in the particular geographical area were known, "an analysis of the ratio of . . . jobs the claimant could perform to the total existing . . . jobs" was "unwarranted". Id. This is because "[t]he plain language of the regulations" does not

REPORT AND RECOMMENDATION
Page - 16

Accordingly, even if credible evidence indicating the lack of jobs in the particular geographic area is presented, "failure to disprove the existence of . . . jobs on a national scale would leave the ALJ's [step five] finding intact." Allen, 816 F.2d at 603. No such evidence, however, has been presented in this case. Nor does the undersigned find decisions from other courts considering this issue, either in this circuit or others, necessarily support plaintiff's contention that 150 jobs in the region are insufficient to constitute a significant number. At least one other district has for example, as noted above, found that even as few as 125 jobs in the region at issue to be sufficient. See Bull, 2009 WL 799966 at *6. Similarly low numbers of jobs have been upheld by other courts as well. See Dumas, 712 F.2d at 1549 (150 jobs in region); Allen, 816 F.2d at 602 (174 jobs in local area).

In support of his contention that 150 jobs in the region is insufficient, plaintiff relies on Coletta v. Massanari, 163 F.Supp.2d 1101 (N.D.Cal. 2001), in which the district court stated it was "unable to locate a single case accepting any number below 500 jobs in a geographical region, let alone all of California, as significant." Id. at 1106-07. While it may be true that the Ninth Circuit itself has not yet so held, and that the Ninth Circuit "has repeatedly held that when thousands of jobs remain performable within regions of California, substantial evidence supports a finding of significant numbers" (see id. at 1106),[6] other circuit and district courts have, as noted above, found far fewer to be sufficient. See Johnson v. Chater, 108 F.3d 178, 180 n.3 (8th Cir. 1997) (200 jobs at state level); Craigie, 835 F.2d at 58 (200 jobs was significant number). In addition, although the Ninth Circuit in Barker found 1,266 jobs to be a significant number, it did so while noting that "[d]ecisions by district courts within this circuit" were "also consistent with" this number, including the decision in Uravith v. Heckler, 1986 WL 83443 (D.Ariz.) (finding that even though 60-70% of 500-600 relevant positions required experience claimant lacked, remaining positions (i.e., 150-240 jobs) constituted significant number). Barker, 882 F.2d at 1478-79.

The Ninth Circuit, furthermore, has stated that "[i]n looking toward the pool of jobs existing in the

---

"contemplate a ratio analysis," but rather speaks "in terms of whether a significant *number* of jobs exist that the claimant is capable of performing." Id. (emphasis in original); see also Hall v. Bowen, 837 F.2d 272, 275 (6th Cir. 1988) ("[W]hen there is testimony that a significant number of jobs exists . . . it is immaterial that this number is a small percentage of the total number of jobs in a given area."). Thus, while the undersigned agrees that the number of jobs existing in a particular geographic area is not determinative as explained above, the Ninth Circuit's decision in Barker does not necessarily support that proposition.

[6] See, e.g., Moncada v. Chater, 60 F.3d 521, 525 (9th Cir. 1995) (2,300 jobs in county and 64,000 nationwide significant); Barker, 882 F.2d at 1479 (1,266 jobs in region significant); see also DeLorme v. Sullivan, 924 F.2d 841, 851 (9th Cir. 1990) (stating that when vocational experts identify several job categories and thousands of jobs performable in state, it has repeatedly found substantial evidence of performable jobs).

REPORT AND RECOMMENDATION
Page - 17

national economy, Congress did not intend to foreclose a claimant from disability benefits on the basis of the existence of a *few isolated jobs*." DeLorme, 924 F.2d at 851 (emphasis added); see also Martinez, 807 F.2d at 775 ("As we have noted previously, the existence of two 'isolated jobs' is not adequate to support a finding that there is a significant number of jobs the claimant is able to perform."); 20 C.F.R. § 416.966(b) (isolated jobs that exist only in very limited numbers in relatively few locations outside of region in which claimant lives are not considered work existing in national economy). Other courts, including the Eighth Circuit noted above, "have agreed with the Commissioner" as well "that a 'significant' number was fairly minimal." Franklin v. Apfel, 8 F.Supp.2d 227, 234 (W.D.N.Y. 1998).

The undersigned, therefore, finds that plaintiff has failed to show, either through evidence presented to the Court or through case law in this circuit or elsewhere, that 150 optical assembler jobs in the State of Washington does not constitute a significant number of jobs existing in the national economy for step five purposes. Even if such were the case, furthermore, plaintiff also has failed to establish, let alone allege, that the 9,000 such jobs the vocational expert testified existed in the national economy failed to constitute a significant number as well. Indeed, that number is not out of line with that which was found by at least one circuit court to be a significant number in the national economy. See Johnson, 108 F.3d at 180 n.3 (10,000 jobs in nation sufficient). While certainly other decisions, as noted above, have involved higher numbers of jobs in the nation, none of those decisions – including the ones from this circuit – exclude the possibility that jobs in the 9,000 to 10,000 range constitute a significant number. Accordingly, the undersigned finds the Commissioner met his burden of proving that plaintiff is capable of performing other jobs existing in significant numbers in the national economy.

## CONCLUSION

Based on the foregoing discussion, the Court should find the ALJ properly concluded plaintiff was not disabled, and should affirm the ALJ's decision. In addition, the Clerk should be directed, as discussed above, to remove from the record all medical progress notes from treating physician, Michael Butler, M.D., for the period of late September through early October 2003, concerning treatment of a right foot injury for a different Michael Hoffman (Tr. 242-45), and replace those pages with a blank page on which is written the following: "Pages 242 through 245 of the administrative record in Hoffman v. Astrue, C09-5252RJB-KLS, have been removed by order of the Court, as they pertain to medical records for an individual who is not the plaintiff, and who is not a party to this case."

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b), the parties shall have **fourteen (14)** days from service of this Report and Recommendation to file written objections thereto. See also Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140 (1985). Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **March 12, 2010**, as noted in the caption.

DATED this 8th day of February, 2010.

Karen L. Strombom
United States Magistrate Judge